## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

_____

BYRON C. MOORE,

          **Plaintiff,**

       **-vs-**                           **Case No.    04-C-655**

DR. ELSA HORN, DR. DAYLEY,
DR. LARSON, KAPLAN,
NANCY BOWENS, SWEET, ALLEN,
JUDY SMITH, and MATTHEW FRANKS,

          **Defendants.**
_____

## DECISION AND ORDER
_____

       Plaintiff Byron C. Moore, who is incarcerated at Oshkosh Correctional Institution (OSCI), filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. The plaintiff was granted leave to proceed *in forma pauperis* on claims that the defendants were deliberately indifferent to his serious medical needs in the care and treatment of his Hepatitis C condition, in violation of the Eighth Amendment to the United States Constitution. The defendants have filed a motion for summary judgment and the plaintiff has filed several motions. All of these motions will be addressed herein.

       On January 31, 2006, the court denied the defendants' August 22, 2005, motion for summary judgment for failure to comply with the Local Rules. Specifically, the defendants'

motion did not contain the required notice statement, *see* Civil L.R. 56.1 (Summary Judgment Motions in Pro Se Litigation), or the text to Civil L.R. 56.1, 56.2, and 7.1. Upon denying the defendants' motion, the court advised the defendants that they could renew their motion for summary judgment, without refiling it, by providing the plaintiff with the notice required in the Local Rules.

On February 7, 2006, the defendants filed their Renewed Motion for Summary Judgment, incorporating by reference their previously submitted supporting brief and affidavits. On March 1, 2006, the plaintiff filed a response incorporating by reference his previously submitted response brief, affidavit, and exhibits. The court will also consider the defendants' September 30, 2005, Response to Plaintiff's Proposed Findings of Fact/Conclusions of Law in Support of Brief in Opposition to Defendants' Motion for Summary Judgment ("Reply").

## SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over

2

"material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The burden of showing the needlessness of trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Anderson*, 477 U.S. at 267; *see also Celotex Corp.*, 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . ."); Fed. R. Civ. P. 56(e) ("When a summary judgment motion is made and supported as provided in [Rule 56(c)], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavit or otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial"). "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989). "However, we are not required to draw every conceivable inference from the record –

3

only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (citation omitted).

## FACTS[1]

The plaintiff has been a Wisconsin Department of Corrections (DOC) inmate since January 11, 1994. (Smith Aff. ¶ 6.) He was incarcerated at Kettle Moraine Correctional Institution (KMCI) and OSCI at all times relevant to this action.

Defendant Dr. Elsa Horn has been a physician licensed to practice in the State of Wisconsin since 1971. (Horn Aff. ¶ 2.) Her specialty is internal medicine and gastroenterology. *Id.* Since 1997, defendant Horn has been employed with the DOC, Division of Adult Institutions, Bureau of Health Services as a physician at KMCI. (Horn Aff. ¶ 3.)

Defendant Dr. George Daley has been a physician licensed to practice in the State of Wisconsin since July 1953. (Daley Aff. ¶ 2.) His primary practice specialty is general surgery. *Id.* On March 1, 1993, defendant Daley began employment with the DOC Bureau of Health Services as physician supervisor. (Daley Aff. ¶ 3.) From April 13, 1997 through April 2001, defendant Daley was the Bureau of Health Services Medical Director. (Daley Aff. ¶¶ 4-5.) Effective May 6, 2001, defendant Daley began employment at Dodge Correctional Institution as a physician. *Id.* Defendant Daley's duties as the Bureau of Health Services Medical Director included formulating, implementing, and monitoring policies, procedures and practice guidelines

---

[1] Facts are taken from the Defendants' Proposed Findings of Fact to the extent that they are undisputed.

to assure delivery of quality medical services to inmates in Wisconsin correctional facilities consistent with standards of practice. (Daley Aff. ¶ 6.)

Defendant Dr. Craig Larson has been a physician licensed to practice in the State of Wisconsin since August 1957. (Larson Aff. ¶ 2.) Defendant Larson's primary practice specialty is psychiatry. *Id.* From October 6, 1993 through February 2, 2005, defendant Larson was employed as a psychiatrist for the DOC as a limited term employee assigned to perform the duties of psychiatrist at KMCI. (Larson Aff. ¶ 3.) His duties included providing psychiatric care to inmates, and prescribing medications when necessary and appropriate based upon his medical expertise and professional judgment. (Larson Aff. ¶ 4.)

Defendant Dr. Roman Kaplan has been a physician licensed to practice in the State of Wisconsin since 1994. (Kaplan Aff. ¶ 2.) Since April 15, 1996, defendant Kaplan has been employed by the DOC as a physician at OSCI. (Kaplan Aff. ¶ 3.)

Defendant Nancy Bowens has been employed with the DOC, Bureah of Health Services, as a nurse practitioner assigned to work in the Health Services Unit at OSCI since September 24, 2001. (Bowens March 17, 2005 Aff. ¶ 2.)[2] Defendant Bowens has been a nurse practitioner since 1996. *Id.* Her duties as a nurse practitioner at OSCI include providing comprehensive health care to the inmate population. (Bowens March 17, 2005 Aff. ¶ 3.) Defendant Bowens is responsible for participating in the planning, development, implementation,

---

[2] Both defendant Bowens' March 17, 2005 affidavit, and her affidavit signed August 15, 2005 and filed in support of the defendants' motion for summary judgment, are cited in the defendants' proposed findings of fact. The March 17, 2005 affidavit was filed in response to the plaintiff's allegation that he was not receiving adequate medical treatment for his Hepatitis C. (Bowens Aug. 15, 2005 Aff. ¶ 4.) It sets forth, in part, the care and treatment the plaintiff received by the OSCI Health Services Unit related to his hepatitis C. *Id.*

Case 2:04-cv-00655-RTR   Filed 08/14/06   Page 5 of 42   Document 123

and evaluation of care and education programs and protocols used by the health care staff to meet the medical needs of the inmate population. *Id.*

Defendant Judy Smith is employed by the DOC as the warden at OSCI. (Smith Aff. ¶ 2.) In her capacity as warden, defendant Smith has the duties and responsibilities as generally defined by Wis. Stat. § 302.04 and as otherwise specifically set forth in the Wisconsin Statutes and Wisconsin Administrative Code. (Smith Aff. ¶ 3.) Defendant Smith is responsible for the overall administration and operation of the institution. (Smith Aff. ¶ 4.) She has the responsibility at the institution level for implementing all DOC policies and directives, administrative codes, and legislative and judicial mandates. *Id.* Although she has general supervisory authority over OSCI administration and operations, defendant Smith does not supervise the day-to-day operations of the OSCI Health Services Unit. (Smith Aff. ¶ 7.) The OSCI Health Services Unit consists of registered nurses and physicians who provide medical care and treatment for OSCI inmates. *Id.* The Health Services Unit employees are supervised by the DOC Bureau of Health Services located in Madison, Wisconsin. *Id.* Defendant Smith's duties as OSCI warden do not include performing any duties related to providing medical treatment to inmates. (Smith Aff. ¶ 8.) Defendant Smith does not have the medical expertise to provide or have any control over the diagnostic and treatment decisions made by the Health Services Unit related to inmates' medical care. *Id.* All disgnostic and treatment services are provided to OSCI inmates, including the plaintiff, by medical professionals who work in the OSCI Health Services Unit. *Id.* During the plaintiff's incarceration at OSCI, defendant Smith has not been made aware

6

that he is subjected to any substantial risk of serious harm due to inadequate medical care and treatment. (Smith Aff. ¶ 9.)

Defendant Matthew J. Frank is employed as Secretary of the DOC; he has held that position since his appointment on January 6, 2003. (Frank Aff. ¶ 2.) Prior to his appointment, defendant Frank was the legal services administrator for the State of Wisconsin, Department of Justice. (Frank Aff. ¶ 3.) In his capacity as Secretary of the DOC, defendant Frank has the responsibilities as generally defined by Wis. Stat. § 15.04, and as otherwise specifically set forth in the Wisconsin Statutes and Wisconsin Administrative Code. (Frank Aff. ¶ 4.) Although he has general supervisory authority over the DOC operations as provided in the Wisconsin Statutes, defendant Frank does not supervise the day-to-day operations of individual health services professionals, including mental health professionals. (Frank Aff. ¶ 6.) In his capacity as Secretary of the DOC, defendant Frank does not provide medical services to inmates at any of the correctional institutions within the DOC. (Frank Aff. ¶ 7.) All diagnostic and treatment services are provided to inmates by the individual Health Services Units located on-site within each correctional institution. *Id.* Defendant Frank has no direct supervisory control over the institution's Health Services Unit, nor does he have any control over their diagnostic and treatment decisions. (Frank Aff. ¶ 8.) Each institution's Health Services Unit is supervised by the DOC Division of Adult Institutions, Bureau of Health Services, who employ registered nurses and physicians to oversee medical care of DOC inmates. *Id.* It is not defendant Frank's responsibility as DOC Secretary to oversee the plaintiff's medical treatment or influence

7

diagnostic and treatment decisions made by the institution's Health Services Unit professional staff. (Frank Aff. ¶ 9.) Defendant Frank has had no in-person contact with the plaintiff. (Frank Aff. ¶ 10.) Defendant Frank is unaware whether the plaintiff was or currently is subjected to any substantial risk of serious harm due to inadequate medical care and treatment. *Id.*

## A. 2001

The plaintiff was housed at KMCI from August 9, 2001 through October 15, 2002. (Horn Aff. ¶ 4.) On September 6, 2001, defendant Larson saw the plaintiff in his capacity as a psychiatrist for the first time. (Larson Aff. ¶ 5.) The plaintiff complained to defendant Larson that he was sleeping poorly. *Id.* Defendant Larson recommended medication to alleviate his difficulty sleeping, and prescribed Doxepin and Paxil (antidepressants with some sedative effects). *Id.*

On September 18, 2001, defendant Horn reviewed and reordered the plaintiff's medications, which included Verapamil and Atenolol (medications to control blood pressure) and Hydrochlorithiazide (hypertension medication). (Horn Aff. ¶ 6, Ex. 1050.) Defendant Horn also ordered monthly blood pressure checks. *Id.*

On October 5, 2001, the plaintiff underwent an EKG. (Horn Aff. ¶ 7, Ex. 1051.) Defendant Horn reviewed the results of the EKG and noted that no changes had occurred since the plaintiff's EKG in 1997. *Id.* On October 8 and October 15, 2001, defendant Larson saw the plaintiff and they discussed the effects of his medication regimen (Doxepin and Paxil). (Larson

8

Aff. ¶ 6, Ex. 1041.) The plaintiff advised defendant Larson that his sleeping was better and the Paxil seemed to help his mood and being around other people. *Id.*

On November 12, 2001, defendant Larson saw the plaintiff. (Larson Aff. ¶ 7, Ex. 1042.) The plaintiff reported to defendant Larson that he was even more depressed. *Id.* The plaintiff also complained that he had more difficulty sleeping. *Id.* Defendant Larson determined to increase both of the plaintiff's medications (Paxil and Doxepin). *Id.*

On December 10, 2001, defendant Larson saw the plaintiff. (Larson Aff. ¶ 8, Ex. 1043.) The plaintiff reported to defendant Larson that he continued to struggle with depression, but his sleeping had slightly improved. *Id.* Defendant Larson determined to increase the Paxil and continue Doxepin. *Id.*

**B. 2002**

On January 17, 2002, defendant Larson saw the plaintiff. (Larson Aff. ¶ 9, Ex. 1044.) The plaintiff reported to defendant Larson that he continued to be depressed and withdrawn from other people. *Id.* Defendant Larson determined to continue the plaintiff's current regimen of medication without any changes. *Id.*

On March 5, 2002, defendant Horn reviewed medications and determined to continue the plaintiff's medications. (Horn Aff. ¶ 8, Ex. 1052.)

On March 25, 2002, defendant Larson saw the plaintiff. (Larson Aff. ¶ 10, Ex. 1045.) The plaintiff reported to defendant Larson that he was taking his medications and sleeping somewhat better. *Id.* The plaintiff also reported that his depression was somewhat better but

9

continued to be a problem. *Id.* Defendant Larson determined to increase Doxepin and continued with Paxil as previously prescribed. *Id.*

On April 5, 2002, defendant Horn reviewed medications and determined to continue the plaintiff's medications. (Horn Aff. ¶ 9, Ex. 1052.) On or about April 3, 2002, the plaintiff underwent a radiological examination related to his elevated blood pressure and syncope (fainting episodes). (Horn Aff. ¶ 10, Ex. 1053.) Both of these reports reported no abnormalities. *Id.* On April 10, 2002, the plaintiff's blood was drawn for laboratory testing to check levels of medications in his system. (Horn Aff. ¶ 11, Ex. 1054.) Defendant Horn reviewed the results of the laboratory testing on April 12, 2002. *Id.* On April 17, 2002, defendant Horn reviewed and reordered the plaintiff's medications. (Horn Aff. ¶ 12, Ex. 1055.) Defendant Horn determined to decrease his dose of Atenolol for one week and then to discontinue. *Id.* Defendant Horn prescribed Lisinopril (blood pressure medication) because the plaintiff was not tolerating the Atenolol. *Id.* On April 17, 2002, defendant Horn ordered blood pressure checks and ordered staff to alert the physician if systolic pressure reached a range between 100-150. (Horn Aff. ¶ 12, Ex. 1055.) On April 17, 2002, defendant Horn completed and signed "Off Site Service Request and Report." (Horn Aff. ¶ 13, Ex. 1056.) Defendant Horn referred the plaintiff to the neurology laboratory to have an EEG performed with sedation. *Id.* Defendant Horn advised the laboratory of the medications that he was currently taking and requested this procedure due to episodes of fainting. *Id.*

10

On April 22, 2002, defendant Larson saw the plaintiff. (Larson Aff. ¶ 11, Ex. 1046.) The plaintiff reported to defendant Larson that he continued to feel depressed and stressed out. *Id.* The plaintiff reported that he did not feel the Paxil was at all effective. *Id.* Therefore, defendant Larson determined to substitute Prozac for the Paxil. *Id.* Defendant Larson also determined to add BuSpar (anti-anxiety) and to continue the Doxepin as previously prescribed. *Id.*

On April 30, 2002, defendant Horn reviewed the plaintiff's medications. (Horn Aff. ¶ 14, Ex. 1057.) On May 7, 2002, defendant Horn reviewed the plaintiff's blood pressure flow sheet and reordered his medications. (Horn Aff. ¶ 15, Ex. 1057.) Defendant Horn determined to decrease Verapamil due to low blood pressure readings. *Id.*

On May 17, 2002, defendant Larson saw the plaintiff. (Larson Aff. ¶ 12, Ex. 1047.) The plaintiff reported to defendant Larson that he felt the depression was somewhat better and he was sleeping better with the Doxepin. *Id.* The plaintiff reported that he had three episodes of passing out, for which he was evaluated by another physician and put on Dilantin. *Id.* Defendant Larson did not feel that any of the medications prescribed by him would contribute to episodes of losing consciousness or passing out. *Id.*

On May 20, 2002, the plaintiff underwent the EEG procedure, and defendant Horn received the EEG report from the UW Health Clinic. (Horn Aff. ¶ 16, Ex. 1058.) The EEG revealed no abnormalities. *Id.* On May 24, 2002, defendant Horn determined to discontinue the plaintiff's afternoon dose of Verapamil based upon her review of the plaintiff's blood pressure

11

recordings that revealed normal to low-normal readings. (Horn Aff. ¶ 17, Ex. 1059.) On June 19, 2002, the plaintiff's blood was drawn for laboratory testing to monitor levels of medications in his system. (Horn Aff. ¶ 18, Ex. 1060.) On June 25, 2002, defendant Horn reviewed the plaintiff's medications, and she determined to discontinue the Dilantin. (Horn Aff. ¶ 19, Ex. 1061.) The plaintiff's EEG was negative for seizures. *Id.*

On July 15, 2002, defendant Larson went to visit the plaintiff while he was housed in the KMCI Segregation Unit. (Larson Aff. ¶ 13, Ex. 1048.) The plaintiff refused to see defendant Larson. *Id.* Defendant Larson determined to continue the plaintiff's current medication regimen, which included Proxac, Doxepin, and BuSpar. *Id.* On July 22, 2002, defendant Larson saw the plaintiff. (Larson Aff. ¶ 14, Ex. 1049.) The plaintiff advised defendant Larson that he continued to have some difficulty sleeping. *Id.* Defendant Larson determined not to increase Doxepin but he added an extra dose of BuSpar during the evening hours. *Id.*

On July 26, 2002, defendant Horn reviewed a July 24, 2002 progress note and noted that the plaintiff had an EEG which was normal and a neurological consultation. (Horn Aff. ¶ 20, Ex. 1062.) Defendant Horn also noted the plaintiff's stress test was negative. *Id.* On August 8, 2002, defendant Horn reviewed laboratory test results from Laboratory Outreach Services. (Horn Aff. ¶ 21, Ex. 1063.) Defendant Horn specifically noted that his blood levels were better since discontinuing Dilantin. *Id.* On August 16, 2002, defendant Horn reviewed the plaintiff's medications and determined to renew the Lisinopril. (Horn Aff. ¶ 22, Ex. 1064.)

12

On September 3, 2002, defendant Horn reviewed progress notes and medications related to the plaintiff. (Horn Aff. ¶ 23, Ex. 1065.) Due to information that the plaintiff had been experiencing seizure-like activities, defendant Horn prescribed Tegretol to replace the Dilantin. *Id.* Tegretol was chosen instead of Dilantin due to an observed increase in the plaintiff's blood enzyme levels that defendant Horn noted on his laboratory tests. (Horn Aff. ¶ 23.) On September 3, 2002, defendant Horn ordered that the plaintiff undergo blood laboratory tests two weeks after starting to take the Tegretol so that she could monitor the effects of this medication. (Horn Aff. ¶ 23, Exs. 1065, 1059.)

On September 26, 2002, defendant Horn ordered a blood test for Hepatitis C virus due to observed persistence of liver function test abnormalities despite the absence of offending medications. (Horn Aff. ¶ 24, Ex. 1066.) On September 26, 2002, defendant Horn reviewed laboratory test results from Laboratory Outreach Services. (Horn Aff. ¶ 25, Ex. 1067.) Defendant Horn specifically noted the levels of Tegretol in the plaintiff's blood system. *Id.* On October 1, 2002, defendant Horn reviewed the plaintiff's medications and determined to renew all prescriptions. (Horn Aff. ¶ 26, Ex. 1066.) On October 11, 2002, defendant Horn reviewed a laboratory report, which indicated that the plaintiff may be infected with Hepatitis C. (Horn Aff. ¶ 27, Ex. 1068.) Defendant Horn ordered a confirmatory Hepatitis C testing and to have him seen after all the test results were in, but the plaintiff transferred out of KMCI before this could be completed. *Id.*

Many medications can cause liver damage due to the fact that some medications are cleared out of the system by the liver. (Horn Aff. ¶ 28.) Medications, if prescribed in recommended dosages, will not cause liver damage if taken properly and in some cases blood work is completed to make sure blood levels and potential side effects are properly monitored. *Id.* All DOC inmates, including the plaintiff, can refuse medical care and treatment or refuse to take medications. (Horn Aff. ¶ 29.) Inmates are free to ask questions related to their medical plan of care and medications that are prescribed on their behalf. *Id.* Communication between the patient and the physician is an integral part of the patient/doctor relationship to determine the most appropriate care plan for each individual patient. *Id.* In all of her contacts with the plaintiff, defendant Horn maintained an open line of communication with him related to his medical care, treatment, and medications. *Id.* As is her practice with all of her patients, including the plaintiff, defendant Horn considered all potential side effects prior to prescribing medications, and defendant Horn monitored the plaintiff's tolerance to medications through laboratory tests and other medical tests. *Id.*

The plaintiff was transferred to OSCI on October 15, 2002. (Bowens Aug. 15, 2005 Aff. ¶ 6, Ex. 1014; Bowens March 17, 2005 Aff. ¶ 11.) In November 2002, the plaintiff was diagnosed with Hepatitis C. (Bowens March 17, 2005 Aff. ¶ 6.) This diagnosis was made upon receiving results of laboratory testing which stated "[p]atient has hepatitis C infection and is currently viremic [evidence of virus in blood system]." *Id.* Hepatitis C is a viral infection of the liver. *Id.* High-risk activities for acquiring Hepatitis C include the use and injection of illegal

14

drugs, and intra nasal drug use. *Id.* The plaintiff indicated on a DOC intake form that he had used cocaine and heroin prior to his incarceration. (Bowens March 17, 2005 Aff. ¶ 6, Ex. 1001.) The plaintiff also admitted to the use of alcohol on a frequent basis prior to his incarceration, which are aggravating factors for liver disease. *Id.* There is no vaccine or other means of preventing Hepatitis C infection. (Bowens March 17, 2005 Aff. ¶ 7.) Avoiding high risk behaviors and high risk activities will decrease the risk of transmission of Hepatitis C. *Id.* There is no known cure for chronic Hepatitis C, although eradication of the virus can sometimes be accomplished through the use of ribavirin pills and interferon injections. (Bowens March 17, 2005 Aff. ¶ 8.) The ribavirin and interferon can have debilitating side effects and many people who become infected with chronic Hepatitis C are excluded from the treatment because of contraindications to interferon and ribavirin. *Id.* Chronic Hepatitis C varies widely in its severity and outcome. (Bowens March 17, 2005 Aff. ¶ 9.) Hepatitis C is considered chronic when a person has it for a period of six months. *Id.* Some patients have the disease for 20+ years before they develop problems related to chronic Hepatitis C. *Id.* Some patients will have no symptoms of liver damage and their liver enzymes will stay at normal levels. *Id.* Other patients, however, may develop chronic Hepatitis C with elevated liver enzymes. *Id.* There is no known treatment to delay the progression of liver injury because of chronic Hepatitis C, other than lifestyle choices such as diet and exercise. (Bowens March 17, 2005 Aff. ¶ 10.) There are limited treatment options. *Id.*

15

On November 4, 2002, defendant Kaplan examined the plaintiff. (Kaplan Aff. ¶ 4, Ex. 1035.) The purpose of his examination was to evaluate seizure and blood pressure control. *Id.* During the examination, the plaintiff offered no complaints and the examination was normal. *Id.*

On November 20, 2002, defendant Bowens met with the plaintiff and provided him with educational literature related to chronic Hepatitis C and discussed with him the avoidance of certain activities that can aggravate chronic Hepatitis C. (Bowens March 17, 2005 Aff. ¶ 12.) Monitoring was initiated immediately upon the diagnosis. *Id.* The method of monitoring the plaintiff's chronic Hepatitis C consisted of blood tests taken on a regular basis that measured his liver enzyme level. *Id.* It is important to conduct regular and periodic blood tests because it is the repeated elevations in liver enzyme levels that can indicate liver injury. *Id.* This is similar to the type of monitoring a person who was not incarcerated would receive. *Id.* The plaintiff was also provided with vaccinations for Hepatitis A and B. *Id.* Defendant Bowens noted one slight elevation of his liver enzyme from a prior blood test, but this was not of grave concern to her at the time. *Id.* It is not uncommon for liver enzymes to fluctuate throughout the course of the disease. *Id.* From 2002 through approximately October 2003, the liver function tests revealed no progression of the plaintiff's chronic Hepatitis C, although the tests were consistent with his stated past history of alcohol and drug use, in conjunction with his chronic Hepatitis C. (Bowens March 17, 2005 Aff. ¶ 13.)

16

On December 3, 2002, defendant Kaplan examined the plaintiff. (Kaplan Aff. ¶ 5, Ex. 1036.) At this time, defendant Kaplan was aware that the plaintiff had been diagnosed with Hepatitis C in November 2002. *Id.* During this examination, the plaintiff reported to defendant Kaplan that he began experiencing "blackouts" approximately ten days prior to the examination. *Id.* The plaintiff also reported that he stopped taking Carbamazepine (used in the treatment of seizure disorders) due to the Ramadan holiday. *Id.* Defendant Kaplan encouraged the plaintiff to take the seizure medication. *Id.* Defendant Kaplan's December 3, 2002 examination of the plaintiff was normal. *Id.* Laboratory tests performed on December 31, 2002, indicated that the plaintiff was noncompliant with taking the prescribed Carbamazepine (anticonvulsant). (Bowens Aug. 15, 2005 Aff. ¶ 8, Ex. 1015.)

## C. 2003

On thirteen occasions in 2003, the plaintiff had testing done to monitor his chronic Hepatitis C, and other medical problems. (Bowens March 17, 2005 Aff. ¶ 15.) During 2003, the plaintiff was seen in the OSCI Health Services on at least fifteen occasions for various medical complaints and problems, including concerns related to chronic Hepatitis C. (Bowens March 17, 2005 Aff. ¶ 16.)

On March 5 and 17, 2003, the plaintiff came to the Health Services Unit and reported concern related to weight loss. (Bowens Aug. 15, 2005 Aff. ¶ 11, Ex. 1018.) Defendant Bowens examined the plaintiff on both of these occasions. *Id.* The plaintiff offered no complaints related to syncopal (fainting) episodes. *Id.* Defendant Bowens' examinations of the

17

plaintiff on March 5 and 17, 2003 were within normal ranges, with the exception of borderline high blood pressure. *Id.* Defendant Bowens found no objective findings of significant weight loss. *Id.* His body mass index was 33, which was elevated for a man of his age, weight, and height. *Id.* The normal range of body mass index for a man of the plaintiff's size is 19-25. *Id.* On April 9, 2003, the plaintiff came to the Health Services Unit and reported concern related to weight loss. (Bowens Aug. 15, 2005 Aff. ¶ 12, Ex. 1019.) Defendant Bowens examined him and noted no objective findings of significant weight loss. *Id.* His body mass index remained elevated. *Id.*

On May 2, 2003, a hepatocellular cancer screen was written. (Bowens Aff. ¶ 13, Ex. 1020.) The screening showed no evidence of liver cancer. *Id.* In May 2003, the plaintiff underwent an abdominal ultrasound to evaluate for hepatoma [liver cancer]. (Bowens March 17, 2005 Aff. ¶ 14, Ex. 1002.) No hepatoma was found. *Id.*

On October 10, 2003, defendant Kaplan examined the plaintiff who had a fainting episode approximately one week before the examination. (Kaplan Aff. ¶ 6, Ex. 1037.) During this examination the plaintiff reported to defendant Kaplan that he had three or four similar fainting episodes over the past two years. *Id.* The plaintiff advised defendant Kaplan that he had stopped taking seizure medication against medical advice two months ago. *Id.* Defendant Kaplan's October 10, 2003 examination of the plaintiff was normal except for an elevated blood pressure reading. *Id.* Defendant Kaplan urged the plaintiff to re-start the seizure medication and

18

the plaintiff agreed.  *Id.*  Defendant Kaplan increased the plaintiff's blood pressure medication with a two month follow up and blood pressure checks in between his visits.  *Id.*

On October 17, 2003, blood tests revealed a second elevation of liver enzyme. (Bowens March 17, 2005 Aff. ¶ 17, Ex. 1003.)  Defendant Bowens was concerned about this elevation because this was the second such elevation over a period of time and could be an indication that the disease was progressing.  *Id.*  On October 17, 2003, defendant Bowens determined it was appropriate to have the plaintiff evaluated by a specialist at the University of Wisconsin (UW) Hepatology Clinic, who could provide the plaintiff with specialized treatment for chronic Hepatitis C.  (Bowens March 17, 2005 Aff. ¶ 17.)

On January 30, 2003, the plaintiff came to the Health Services Unit and reported concern related to laboratory follow up for Hepatitis C.  *Id.*  Defendant Bowens advised the plaintiff that laboratory results would be routinely conducted and monitored, and treatment would be based upon the laboratory results.  (Bowens Aug. 15, 2005 Aff. ¶ 9, Ex. 1016.)  Laboratory tests to monitor Carbamazepine levels, liver functioning tests, and various other blood-related laboratory tests were ordered and completed on March 4, 12, 2003; April 22, 2003; May 1, 17, 21, 2003; December 20, 2003; January 5, 2004; February 18, 2004; March 16, 2004; June 17, 2004; July 23, 2004; August 17, 26, 2004; September 24, 2004; October 8, 20, 28, 29, 2004; November 2, 4, 17, 26, 2004; December 14, 15, 2004; and February 13, 14, 2005.  (Bowens Aug. 15, 2005 Aff. ¶ 10, Ex. 1017.)

19

On October 29, 2003, defendant Bowens examined the plaintiff. (Bowens Aug. 15, 2005 Aff. ¶ 14, Ex. 1021.) Defendant Bowens' examination revealed no abnormalities. *Id.*

On November 17, 2003, defendant Bowens spoke with the plaintiff regarding elevated liver functioning laboratory test results, and they discussed treatment options. (Bowens Aug. 15, 2005 Aff. ¶ 15, Ex. 1022.) Defendant Bowens ordered a baseline EKG, psychiatric clearance, and additional blood tests. *Id.* On November 17, 2003, the plaintiff signed "Hepatitis C Treatment Consent." (Bowens March 17, 2005, Aff. ¶ 18, Ex. 1004.) The November 17, 2003 consent form advised the plaintiff that ". . . forms of interferon/ribavirin combination therapy represents the best option for treatment of Hepatitis C virus infection." *Id.* The plaintiff was also advised that ". . . there are no viable alternative pharmalogical modes of treatment." *Id.* The consent form provided the plaintiff with information related to the serious side effects associated with Hepatitis C treatment including, but not limited to, worsening of liver inflammation, anemia, allergic reaction, heart attack, severe depression, suicide, pneumonia, loss of vision or thyroid disease. (Bowens March 17, 2005 Aff. ¶ 16, Ex. 1004.)

## D. 2004

On nineteen different occasions in 2004, the plaintiff received at least fifteen blood tests to monitor his chronic Hepatitis C and other medical problems. (Bowens March 17, 2005 Aff. ¶ 19.) During 2004, the plaintiff was seen in the OSCI Health Services Unit on at least forty-two occasions for various medical complaints and problems, including concerns related to chronic Hepatitis C. (Bowens March 17, 2005 Aff. ¶ 20.)

20

On March 5, 2004, defendant Bowens requested authorization for the plaintiff to be examined at the UW Hepatology Clinic. (Bowens March 17, 2005 Aff. ¶ 21, Ex. 1005.) Defendant Bowens' request for authorization was approved and an appointment was scheduled for March 23, 2004. *Id.*

On March 8, 2004, defendant Kaplan examined the plaintiff. (Kaplan Aff. ¶ 7, Ex. 1038.) During this examination, the plaintiff reported to defendant Kaplan that he had been taking the seizure medication. *Id.* Defendant Kaplan's March 8, 2004 examination of the plaintiff was normal except for an elevated blood pressure reading. *Id.* Defendant Kaplan reordered the plaintiff's blood pressure medications and ordered a blood test for his seizure medication. *Id.* On March 18, 2004, laboratory testing determined that the plaintiff was not truthful related to his use of the seizure medication. (Kaplan Aff. ¶ 8, Ex. 1039.) Defendant Kaplan met with the plaintiff who was argumentative and stated that the medication was poisoning him. *Id.* Because the plaintiff was also refusing psychotropic medications, defendant Kaplan referred him to the psychiatrist. *Id.* Defendant Kaplan has not seen the plaintiff since March 18, 2004. (Kaplan Aff. ¶ 9.) The plaintiff is being monitored and treated by defendant Bowens under defendant Kaplan's supervision. *Id.*

On March 23, 2004, the plaintiff was seen by Physician Assistant Lisa Cervantes at the UW Hepatology Clinic. (Bowens March 17, 2005 Aff. ¶ 22, Ex. 1006.) Ms. Cervantes recommended the plaintiff be scheduled for a liver biopsy, and that he have an eye screening and evaluation by a mental health professional to determine his suitability to undergo treatment with

interferon and ribavirin. *Id.* A combination of interferon and ribavirin is the standard treatment for some patients with chronic Hepatitis C. (Bowens March 17, 2005 Aff. ¶ 23.)

On April 5, 2004, a liver biopsy was conducted. (Bowens Aug. 15, 2005 Aff. ¶ 17; Bowens March 17, 2005 Aff. ¶ 24, Ex. 1007.) This biopsy indicated the plaintiff had stage II fibrosis [scar tissue]. *Id.* Stage IV fibrosis would indicate cirrhosis of the liver, which could progress to decompensated cirrhosis [loss of the liver's ability to function]. *Id.* An additional complication could be liver cancer. *Id.* It is important to note that one stage does not necessarily progress to the next stage. *Id.*

On April 30, 2004, the plaintiff was seen by Physician Assistant Lisa Cervantes at the UW Hepatology Clinic. (Bowens March 17, 2005 Aff. ¶ 25, Ex. 1008.) Dr. Michael Lucey was the collaborative physician. *Id.* Ms. Cervantes recommended the plaintiff receive a psychiatric clearance and then be started on interferon and ribavirin. *Id.*

On June 16, 2004, defendant Bowens met with the plaintiff and discussed treatment of his Hepatitis C. (Bowens Aug. 15, 2005 Aff. ¶ 19, Ex. 1023.) The plaintiff signed another "Hepatitis C Treatment Consent" form. (Bowens Aff. Aug. 15, 2005 Aff. ¶ 20, Ex. 1069.) This form again provided the plaintiff with information related to the serious side effects of Hepatitis C treatment. *Id.*

On July 7, 2004, orders were written for interferon and ribavirin. (Bowens Aug. 15, 2005 Aff. ¶ 21, Ex. 1024.) Laboratory tests to monitor for the side effects of these medications were also written. *Id.* On July 30, 2004, defendant Bowens spoke with the plaintiff

22

regarding chronic Hepatitis C viral eradication therapy (interferon and ribavirin). (Bowens Aug. 15, 2005 Aff. ¶ 22.)

On August 2, 2004, the plaintiff began the interferon and ribavirin medications as recommended by the UW Hepatology Clinic. (Bowens March 17, 2005 Aff. ¶ 27.) Blood tests, including measurements of liver enzyme levels, were used to determine if the medications were working to eradicate the Hepatitis C virus. *Id.* Viral load tests, which measure the amount of the virus in the blood system, were also ordered and completed. *Id.* At all times during his OSCI incarceration, the plaintiff's liver enzyme levels were monitored through regular and periodic blood tests and viral load tests. *Id.*

On August 16, 2004, defendant Bowens examined the plaintiff. (Bowens Aug. 15, 2005 Aff. ¶ 24, Ex. 1023.) The plaintiff complained of the expected side effects from the interferon and ribavirin therapy. *Id.* The plaintiff's symptoms included vision changes, flu-like symptoms, irritability, and insomnia. *Id.* Defendant Bowens noted an elevation in the plaintiff's blood pressure. (Bowens Aug. 15, 2005 Aff. ¶ 6, Ex. 1023.) Defendant Bowens referred the plaintiff to the institution's psychiatrist and optician, and also ordered blood pressure checks. *Id.*

On August 20, 2004, the plaintiff was examined by the institution's psychiatrist who cleared him to continue the interferon and ribavirin therapy. (Bowens Aug. 15, 2005 Aff. ¶ 25, Ex. 1025.) On August 26, 2004, the plaintiff was evaluated by the optician who diagnosed retinopathy – a potential side effect of interferon and ribavirin. (Bowens Aug. 15, 2005 Aff. ¶ 26, Ex. 1025.)

23

On September 23, 2004, defendant Bowens examined the plaintiff. (Bowens Aug. 15, 2005 Aff. ¶ 27, Ex. 1026.)  His blood pressure was stabilized.  *Id.*  Flu-like symptoms, irritability, and insomnia complaints were decreasing.  *Id.*  A weight loss of eight pounds was noted, and an extra calorie diet was ordered.  *Id.*  Monitoring laboratory tests continued to be ordered.  *Id.*

On October 14, 2004, defendant Bowens reviewed laboratory test results that indicated a drop in hemoglobin hemacrit, and forwarded those findings to the UW clinic for recommendations.  (Bowens Aug. 15, 2005 Aff. ¶ 28, Ex. 1026.)  On October 21, 2004, the plaintiff was sent to the UW Retina Clinic related to problems with his eyes.  (Bowens March 17, 2005 Aff. ¶ 28, Ex. 1010.)  This was a concern because visual problems can be a side effect of the interferon/ribavirin medication therapy.  *Id.*  It was requested that the eye clinic examine the plaintiff to determine if his eye problems were due to the medications he was taking for chronic Hepatitis C.  *Id.*  On October 21, 2004, the OSCI Health Services Unit received a telephone call from the UW Hepatology Clinic regarding the plaintiff's treatment. *Id.*  Based upon laboratory results, is was recommended that the plaintiff receive Procrit [to fight fatigue/anemia] two times on a weekly basis and to recheck laboratory tests again after two weeks.  *Id.*  Anemia can be a debilitating side effect of the interferon/ribavirin medications.  *Id.*  Follow up testing indicated that the Procrit was effective in reducing the plaintiff's fatigue/anemia.  *Id.*

On October 27 and 29, 2004, defendant Bowens examined the plaintiff related to an annual review for inmates with past positive tuberculosis tests.  (Bowens Aug. 15, 2005 Aff.

¶ 30, Exs. 1026-28.)  He was coughing and had a decrease in air exchange in one lung.  *Id.*

Defendant Bowens ordered a chest x-ray for the plaintiff, and ordered that he be retained in the

Heath Services Unit pending results of the tuberculosis test.  *Id.*  The plaintiff was "feeling

better" on October 29.  *Id.*  On November 5, 2004, defendant Bowens noted the plaintiff's

tuberculosis results returned negative, and he returned to inmate general population with no fever

or symptoms.  (Bowens Aug. 15, 2005 Aff. ¶ 31, Ex. 1029.)

On November 15, 2004, the plaintiff was seen by Ms. Cervantes at the UW

Hepatology Clinic.  (Bowens March 15, 2005 Aff. ¶ 30, Ex. 1012.)  Ms. Cervantes noted that the

plaintiff had been on treatment with interferon and ribavirin for about sixteen weeks and was

having some problems tolerating the medications.  *Id.*  Ms. Cervantes recommended the plaintiff

continue the medications and receive laboratory tests after twenty-four weeks of treatment.  *Id.*

On November 16, 2004, defendant Bowens examined the plaintiff, who complained

of fever, chills, and chest tightness with activities.  (Bowens Aug. 15, 2005 Aff. ¶ 33, Ex. 1030.)

Defendant Bowens noted a decrease in air exchange in one lung, and he tested positive for

reactive disease (asthma).  *Id.*  Defendant Bowens ordered that the plaintiff be started on

antibiotics and provided with an inhaler.  *Id.*

On November 18, 2004, defendant Bowens examined the plaintiff, who advised

that his cough was improving.  (Bowens Aug. 15, 2005 Aff. ¶ 34.)  At that time the plaintiff

stated he was not being forthright with the psychiatrist and his depression could be increasing.

*Id.*  Defendant Bowens encouraged him to be forthright with the psychiatrist.  *Id.*  Monitoring

Case 2:04-cv-00655-RTR   Filed 08/14/06   Page 25 of 42   Document 123

labs continued to be ordered. *Id.* On November 19, 2004, laboratory test results revealed that the plaintiff continued to have detectable Hepatitis C virus in his blood. (Bowens Aug. 15. 2005 Aff. ¶ 35, Ex. 1031.)

On December 14, 2004, defendant Bowens examined the plaintiff, who complained of insomnia, fatigue, and rash at injection site. (Bowens Aug. 15, 2005 Aff. ¶ 36, Ex. 1032.) The plaintiff's weight dropped six pounds, from 214 to 208. *Id.* Defendant Bowens ordered cream to control the itching and antibiotic to clear any possible infection at the injection site. *Id.*

On December 21, 2004, defendant Bowens examined the plaintiff. (Bowens Aug. 15, 2005 Aff. ¶ 37, Ex. 1033.) His weight was 202. *Id.* The rash and infection near the injection site was resolved by the use of the cream and antibiotic. *Id.*

**E. 2005**

On January 13, 2005, defendant Bowens examined the plaintiff, who complained of left chest wall pain. (Bowens Aug. 15, 2005 Aff. ¶ 38, Ex. 1034.) Defendant Bowens checked his blood pressure, which was within normal range. *Id.* His weight was 212 pounds. *Id.* A nonsteroidal anti-inflammatory drug was prescribed for the plaintiff's chest pain; the plaintiff refused this medication. *Id.* Defendant Bowens ordered laboratory tests for hypertension and advised the plaintiff to seek medical services if his symptoms of chest wall pain persisted. *Id.*

On February 7, 2005, the plaintiff was seen by the UW clinic, where it was determined that the plaintiff was an interferon and ribavirin treatment non-responder. (Bowens Aug. 15, 2005 Aff. ¶ 39; Bowens March 17, 2005 Aff. ¶ 31, Ex. 1013.) Therefore, the risks of

continued interferon and ribavirin use became greater than any benefits they would provide. *Id.* The medications were discontinued at the recommendation of the UW clinic. *Id.* The plaintiff's interferon and ribavirin were discontinued on February 8, 2005. (Bowens March 17, 2005 Aff. ¶ 32.) Currently, there is no other FDA-approved treatment for chronic Hepatitis C. *Id.*

On February 24, 2005, the plaintiff was seen at the OSCI Health Services Unit. (Bowens March 17, 2005 Aff. ¶ 33.) On this date, the plaintiff was advised that the Health Services Unit would continue to monitor his liver and other vital organs through blood tests and that appropriate referrals would be made based on clinical findings and blood test results. *Id.* The plaintiff's blood pressure would continue to be monitored on a regular basis and he was advised to quit smoking, monitor his diet, and exercise. *Id.*

At all times during her examinations of the plaintiff, defendant Bowens provided appropriate care based upon appropriate medical standards, her medical expertise, and experience as a licensed nurse practitioner under the supervision of a licensed physician. (Bowens Aug. 15, 2005 Aff. ¶ 40.) Hepatitis C is a serious medical condition and the plaintiff has been shown to have this disorder. (Bowens Aug. 15, 2005 Aff. ¶ 41.) Defendant Bowens has at all times assisted in providing the plaintiff with appropriate care, in part, by monitoring his liver functions through blood tests; ordering a liver biopsy; making arrangements for his referral to the UW Gastroenterology Clinic; monitoring his interferon and ribavirin therapy as recommended by the clinic; and making arrangements for his referral to an optician related to vision problems from the interferon and ribavirin therapy. *Id.* Defendant Bowens currently continues to monitor the

27

plaintiff's Hepatitis C by ensuring that he receives liver functioning tests and an examination at least every six months. (Bowens Aug. 15, 2005 Aff. ¶ 42.) The plaintiff continues to receive health services for medical issues unrelated to Hepatitis C. *Id.*

The plaintiff is not eligible for a liver transplant because his liver is functioning. (Bowens March 17, 2005 Aff. ¶ 34.) The plaintiff's liver would need to show evidence of decompensated cirrhosis [inability of the liver to function] to be considered for a liver transplant. *Id.* The plaintiff's most recent liver biopsy showed no signs of cirrhosis or cancer. *Id.*

At all times during his incarceration at KMCI and defendant Horn's personal contacts with him, or her reviews of the plaintiff's medications, defendant Horn provided appropriate medical care and treatment based upon appropriate medical standards, her medical expertise, and experience as a licensed physician. (Horn Aff. ¶ 30.)

Defendant Daley does not recall having any personal contact with the plaintiff. (Daley Aff. ¶ 10.) It would not have been his responsibility as Bureau of Health Services Medical Director to conduct a physical examination of the plaintiff or be involved in his medical care or treatment, unless the institution's physician or physician assistant requested his consultation and/or asked him to authorize a specific procedure or treatment. *Id.* Defendant Daley does not recall being asked to consult related to the plaintiff's medical care, treatment, or diagnosis, or being asked to approve a specific procedure or treatment. *Id.* Defendant Daley reviewed the plaintiff's medical records maintained by the OSCI Health Services Unit, and was assisted by Bureau of Health Services Nursing Consultant Kathleen Berkley. (Daley Aff. ¶ 11.)

28

The medical records that were reviewed covered the time period from the plaintiff's initial DOC incarceration in 1994 through March 2005. *Id.* There is no evidence from the medical records that defendant Daley and Ms. Berkley reviewed, which indicated that defendant Daley was involved in the diagnosis, consultation, care, or treatment of the plaintiff's Hepatitis C and any other medical condition. (Daley Aff. ¶ 12.) There is no evidence in the medical records that defendant Daley and Ms. Berkley reviewed which indicated that defendant Daley prescribed any medications for the plaintiff. (Daley Aff. ¶ 13.) At no time has defendant Daley been aware that the plaintiff is subject to any substantial risk of serious harm due to inadequate medical care or treatment. (Daley Aff. ¶ 14.)

Defendant Kaplan acknowledges that Hepatitis C is a serious medical condition and the plaintiff has been shown to have this disorder. (Kaplan Aff. ¶ 10.) Defendant Kaplan has at all times provided the plaintiff with appropriate medical care to treat this disorder. *Id.* Defendant Kaplan has taken into consideration the use of prescribed medications, ordered laboratory tests and objective examination findings to monitor this condition. *Id.* Defendant Kaplan has at all times during his examinations of the plaintiff provided timely, appropriate, and reasonable care based upon medical standards and his medical knowledge and expertise as a licensed physician. (Kaplan Aff. ¶ 11.)

At all times during his contacts with the plaintiff, defendant Larson took appropriate measures to monitor the medications that he prescribed in order to reduce the occurrence of adverse drug events. (Larson Aff. ¶ 15.) Additionally, defendant Larson recited

29

to the plaintiff possible side effects of each medication that he prescribed for him, and the plaintiff agreed to take the medications. *Id.* At all times during his contacts with the plaintiff, defendant Larson was aware of other drugs that the plaintiff had been prescribed by KMCI Health Services Unit physicians and nurse practitioners, and it was his professional opinion that none of the drugs interacted with each other to subject the plaintiff to adverse side effects or drug interaction effects. (Larson Aff. ¶ 16.) At all times during his contacts with the plaintiff, defendant Larson exercised his medical judgment in prescribing medications to alleviate the plaintiff's subjective complaints of depression and sleeplessness. (Larson Aff. ¶ 17.) At all times during his contacts with the plaintiff, defendant Larson provided timely, appropriate and reasonable care based upon medical standards and his medical knowledge and expertise as a licensed psychiatrist. (Larson Aff. ¶ 18.)

## ANALYSIS

The defendants contend that they were not deliberately indifferent to the plaintiff's serious medical needs. They argue that the plaintiff cannot establish that any defendant both knew of and disregarded an excessive risk to the plaintiff's safety. The plaintiff, on the other hand, contends that the defendants were deliberately indifferent to his serious medical needs. Futhermore, he argues that there are genuine issues of fact pertaining to the defendants' medical care of him and that therefore the defendants' motion for summary judgment should be denied.

To establish liability under the Eighth Amendment, a prisoner must show: (1) that his medical need was objectively serious; and (2) that the official acted with deliberate

30

indifference to the prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); *see also Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 810 (7th Cir. 2000).

The defendants concede that the plaintiff's medical condition is sufficiently serious. *See also Zentmyer*, 220 F.3d at 810 (medical condition diagnosed by a physician as needing treatment is objectively serious). Therefore, the court will consider the second, subjective component of an Eighth Amendment claim.

A prison official acts with deliberate indifference when "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Prison officials act with deliberate indifference when they act "intentionally or in a criminally reckless manner." *Tesch v. County of Green Lake*, 157 F.3d 465, 474 (7th Cir. 1998). Neither negligence nor even gross negligence is a sufficient basis for liability. *See Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991). A finding of deliberate indifference requires evidence "that the official was aware of the risk and consciously disregarded it nonetheless." *Chapman*, 241 F.3d at 845 (citing *Farmer*, 511 U.S. at 840-43).

## A. Defendants Matthew Frank and Judy Smith

The defendants contend that since defendant Frank, who is the Secretary of the DOC, and defendant Smith, who is the warden at OSCI, were never involved in the plaintiff's care, the plaintiff cannot establish that either defendant both knew of and disregarded an excessive risk to his health or safety. According to the plaintiff, defendants Frank and Smith

31

were advised of the inadequate medical treatment that defendants Kaplan and Bowen were administering to him by way of inmate grievances filed by the plaintiff. Moreover, defendants Frank and Smith refused to stop these atrocities from continuing which resulted in further irreparable injury to the plaintiff.

According to the plaintiff, on March 18, 2003, he submitted a complaint to defendant Smith, advising her that defendants Kaplan and Bowens were denying him medical treatment for his Hepatitis C disease. (Pl.'s Proposed Finding of Fact [PFOF] ¶ 34.)[3] Apparently, defendant Smith did not respond to this complaint. The plaintiff subsequently submitted a complaint to defendant Frank, advising him that defendants Kaplan and Bowens were misdiagnosing him with a seizure disorder, prescribing inadequate medications for seizures and prescribing other medications excessively, which was causing damage to his liver. (Pl.'s PFOF ¶ 35.) Defendant Smith responded to the letter that the plaintiff wrote to defendant Frank. (Pl.'s PFOF ¶ 36.) Defendant Smith's October 21, 2003, memorandum to the plaintiff states:

> I have received a copy of the letter you sent to Secretary Frank. He has asked that I respond directly to you on his behalf.
>
> Dr. Kaplan informed me that on 10/10/03 you were examined. You had an episode of loss of consciousness. A detailed review of your previous medical history revealed that you have had a history of

---

[3] Plaintiff's PFOF ¶ 34 cites to an Exhibit 14, attached to his amended complaint. The court can construe a sworn complaint as an affidavit at the summary judgment stage. *See Ford v. Wilson*, 90 F.3d 245, 246 (7th Cir. 1996). However, there are no exhibits attached to the plaintiff's December 15, 2004 amended complaint, the operative complaint in this action.

There are several attachments to the plaintiff's November 10, 2004 proposed amended complaint, including Exhibit 14, which is a March 18, 2003 letter to defendant Smith. This proposed amended complaint is not the operative complaint in this action and it is not sworn. Thus, an attachment to it is not properly considered evidence for the purposes of resolving the defendants' summary judgment motion. *See* Fed. R. Civ. P. 56(e). However, the court will still address the plaintiff's arguments referencing the exhibits attached to the November 10, 2004 proposed amended complaint.

seizure-like episodes in the past, which, according to your report was controlled while you used an anti-convulsive medication, Tegretol. You then consulted a neurology clinic in May of 2002 and an EEG was done which did not reveal a typical pattern for epilepsy. Even with the negative results, it was recommended that you continue the use of Tegretol and that you did not have any seizures upon doing so.

Two months ago, you took yourself off of Tegretol against medical advice and since then, have developed several episodes of loss of consciousness. Dr. Kaplan has had a long discussion with you, and advised you to restart the anti-convulsive medication, which obviously provided control of your condition. Dr. Kaplan has informed me that you agreed with this course of action, and your agreement is specifically reflected on Dr. Kaplan's progress notes dated 10/10/03.

(*Id.*; citing Pl.'s Nov. 10, 2004 Proposed Amended Complaint, Ex. R.)

Non-medical prison officials cannot be held "deliberately indifference" simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by a prison doctor. *Johnson v. Doughty*, 433 F.3d 1001, 1012 (7th Cir. 2006) (citations omitted). In *Johnson*, 433 F.3d at 1010, the court found that a prison's grievance counselor, a prison official responsible for investigating inmates' grievances, was not deliberately indifferent because he did not disregard the inmate's complaints. Rather, the grievance counselor "investigated the situation, made sure that the medical staff was monitoring and addressing the problem, and reasonably deferred to the medical professionals' opinions." *Id.* Thus, the court concluded, the grievance counselor was "insulated from liability because he 'responded reasonably' to [the prisoner's] complaint." *Id.* at 1011 (citations omitted). The court went on

33

quote with approval the Third Circuit's recent analysis of the issue of non-medical prison officials' liability in Eighth Amendment medical care cases:

> If a prisoner is under the care of medical experts ..., a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prison was under a physicians' care would strain this division of labor . . . . Accordingly, we conclude that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.

*Id.* at 1011 n.9.

It is undisputed that defendant Smith, in her capacity as warden at OSCI, does not supervise the day-to-day operations of the Health Services Unit, does not have the medical expertise to provide or have any control over the diagnostic and treatment decisions made by the Health Services Unit related to inmates' medical care, and was not made aware that the plaintiff was subjected to any substantial risk of serious harm due to inadequate medical care and treatment. It is also undisputed that defendant Frank, in his capacity as Secretary of the DOC, does not supervise the day-to-day operations of individual health services professionals, has no direct supervisory control over the institutions' Health Services Units, and is unaware whether the plaintiff was or currently is subjected to any substantial risk of serious harm due to inadequate medical care and treatment. In short, there is no evidence in the record to support the plaintiff's

34

contention that defendants Frank and Smith were deliberately indifferent to his serious medical needs.

**B. Defendant George Daley**

The defendants contend that the plaintiff cannot establish that defendant Daley was aware of any substantial risk of serious harm due to allegedly inadequate treatment and therefore the plaintiff cannot meet his burden of proof with respect to defendant Daley and he is thus entitled to summary judgment as a matter of law. The plaintiff contends that defendant Daley prescribed him medication (Atenol, Verapamil, HCTZ, and Metamucil) in 2001, and that the plaintiff was never advised of the side effects or dangers of those medications. (Pl.'s Br. at 11, Ex. 10.) As a result, the plaintiff asserts that he was deprived of the right to make any informed decisions to reject that form of treatment.

The plaintiff's Exhibit 10, Patient Medication Profile, indicates that defendant Daley prescribed the plaintiff several medications. However, beyond the notation contained in Exhibit 10, there is nothing in the record indicating that defendant Daley was the plaintiff's doctor or had anything to do with his medical care. (*See* Daley Aff. ¶¶ 2-6, 10-14.) The undisputed facts reveal that defendant Daley was not deliberately indifferent to the plaintiff's serious medical needs.

**C. Defendants Elsa Horn, Craig Larson, Roman Kaplan, and Nancy Bowens**

Defendants Horn, Larson, Kaplan, and Bowens contend that they have provided responsive and professional medical care to the plaintiff. Accordingly, these defendants argue

that they are entitled to summary judgment because the plaintiff cannot meet his burden of proof that any of them acted in knowing disregard to the plaintiff's health or safety.

The plaintiff contends that defendant Horn acted with gross and criminal negligence by prescribing medications for an illness, seizures, that the plaintiff did not have.[4] (*See* Pl.'s Br., Ex. 18.)  Also, the plaintiff asserts that defendant Horn acted with a reckless disregard for the serious risk of harm to the plaintiff's health and safety by prescribing medication inadequately and that she knew causes liver damage.  (Pl.'s Br., Ex. 26.)

The plaintiff contends that defendant Larson prescribed doxepin, knowing that this medication causes liver toxicity.  According to the plaintiff, defendant Larson also knew fluoxetine and buspirone should not be combined because that would cause increased mental disorder and anxiety.  (Pl.'s Br., Ex. 12.)  The plaintiff asserts that defendant Larson prescribed medication recklessly which exacerbated the plaintiff's liver damage.  Defendant Larson knowingly, willfully, and intentionally refused to request and/or conduct any tests to check for liver damage.  He prescribed doxepin, paroxetine, fluoxetine, and buspuone to the plaintiff without advising him of the side effects or dangers of those medications, which deprived the plaintiff of the right to reject treatment.  (Pl.'s Br., Exs. 10, 12.)  Defendant Larson prescribed these medications simultaneously with medications prescribed by defendant Horn (atenol,

---

[4] The plaintiff's is undecided on whether he had a seizure disorder.  (Compare Pl.'s PFOF ¶ 10, ("It's a fact, supported w/by clear evidence Moore was dianosed [sic] with a seizure disorder (see Exhibit #21 – front cover of Moore's medical records)) with Pl.'s PFOF ¶¶ 13-15 (pointing out that defendant Horn prescribed the plaintiff medication for seizures absent medical evidence of seizure disorder)).

lisinopin, verapamil, HCTZ, E.C. asa, and carbamazepine) and knew that further irreparable harm would be caused to the plaintiff's liver.

The plaintiff contends that defendants Kaplan and Bowens denied and delayed for eighteen months, November 2002 through August 2004, medical treatment for his liver damage, by refusing to conduct medical tests to determine the extent of the damage. According to the plaintiff, defendants Kaplan and Bowens denied the plaintiff medication and treatment to treat his Hepatitis C disease, knowing the disease would get worse and causing further serious harm to his liver. (Pl.'s Br., Exs. 19, 25.) The plaintiff also asserts that on February 25, 2004, he submitted a health service request advising defendants Kaplan and Bowens that he was suffering pains in his chest and liver. (Pl.'s Br., Ex. 9.) The request was returned to the plaintiff without him receiving any medical attention and with the statement, "you must see a more advanced medical care provider." *Id.* As a result of not being seen by either defendant Kaplan or Bowens, the plaintiff fainted on February 29, 2004. The plaintiff did not see defendant Kaplan for approximately one week and was forced to suffer pain throughout that entire time due to no medical treatment.

In the context of medical professionals, "it is important to emphasize that medical malpractice, negligence, or even gross negligence does not equate to deliberate indifference." *Johnson*, 433 F.3d at 1012-13 (citing *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 592 (7th Cir. 1999)). Dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient. *Johnson*, 433 F.3d at 1013 (citing *Snipes v. DeTella*, 95 F.3d 586, 592

(7th Cir. 1996)).  For instance, it is not enough to show that a doctor should have known that surgery was necessary; rather, the doctor must know that surgery was necessary and then consciously disregard that need in order to be held deliberately indifferent.  *Johnson*, 433 F.3d at 1013 (citation omitted).

However, "a trier of fact can conclude that the professional knew of the need from evidence that the serious medical need was obvious." *Collignon*, 163 F.3d at 989; *see also Steele v. Choi*, 82 F.3d 175, 179 (7th Cir. 1996) ("If the symptoms plainly called for a particular medical treatment – the leg is broken, so it must be set; the person is not breathing, so CPR must be administered – a doctor's deliberate decision not to furnish the treatment might be actionable under § 1983").  In addition, a medical professional's erroneous treatment decision can lead to deliberate indifference liability if the decision was made in the absence of professional judgment. *See Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998) ("A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances."); *Cole v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996) ("[D]eliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment").

38

In determining whether an official's conduct rises to the deliberate indifference standard, a court may not look at the alleged acts of denial in isolation; it "must examine the totality of an inmate's medical care." *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997). In *Gutierrez*, isolated incidents of delay, during ten months of prompt, extensive treatment did not amount to deliberate indifference. *Id.* Similarly, in *Dunigan v. Winnebago County*, 165 F.3d 587, 591 (7th Cir. 1999), "factual highlights" of neglect over a month and a half of otherwise unobjectionable treatment were insufficient to avoid summary judgment. "[A]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996).

In this case, the plaintiff repeatedly maintains that defendants Horn, Larson, Kaplan, and Bowens were deliberately indifferent to his serious medical needs. However, the fact that the plaintiff avers this does not by itself overcome summary judgment. "It is well-settled that conclusory allegations . . . without support in the record, do not create a triable issue of fact." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002) (citing *Patterson v. Chi. Ass'n for Retarded Citizens*, 150 F.3d 719, 724 (7th Cir. 1998)).

The undisputed facts reveal that the plaintiff was housed at KMCI from August 9, 2001 until October 15, 2002. During that time, defendant Horn worked there as a physician and defendant Larson worked there as a psychiatrist. Both defendants provided medical services to the plaintiff during that time, seeing him in person and reviewing his medication. There is

39

nothing in the record to indicate that either defendant Horn or Larson were deliberately indifferent to the plaintiff's medical needs. Rather, the record suggests the opposite. (*See* Horn Aff. ¶¶ 6-27; Larson Aff. ¶¶ 5-14, Exs. 1040-49.)

The undisputed facts also reveal that the plaintiff was transferred to OSCI on October 15, 2002, where he was treated by defendant Bowens and Kaplan. The plaintiff was diagnosed with Hepatitis C in November 2002. On thirteen occasions in 2003, the plaintiff had testing done to monitor his Hepatitis C and other medical problems. He was seen in the OSCI Health Services on at least fifteen occasions in 2003 for various medical complaints and problems, including concerns related to Hepatitis C. After a second elevation of liver enzyme, defendant Bowens referred the plaintiff to a specialist at the UW Hepatology Clinic. Numerous laboratory tests were done between March 2003 and February 2005 to monitor Carbamazepine levels, liver functioning tests, and various other blood-related laboratory tests. The plaintiff discussed treatment options with defendant Bowens on November 17, 2003, and also signed a Hepatitis C Treatment Consent form on that date. On nineteen occasions in 2004, the plaintiff received at least fifteen blood tests to monitor his Hepatitis C and other medical problems. During 2004, the plaintiff was seen in the OSCI Health Services Unit on at least forty-two occasions for various medical complaints and problems, including concerns related to Hepatitis C. On June 16, 2004, defendant Bowens met with the plaintiff and discussed treatment of his Hepatitis C. The plaintiff signed another Hepatitis C Treatment Consent form, which again provided him with information related to the serious side effects of Hepatitis C treatment. On

40

February 7, 2005, the plaintiff was seen by the UW clinic where it was determined that he was an interferon and ribavirin treatment non-responder and that therefore the risks of continued interferon and ribavirin use was greater than any benefits. The plaintiff's interferon and ribavirin were discontinued on February 8, 2005. On February 24, 2005, the plaintiff was seen at the OSCI Health Services Unit and was advised that the Unit would continue to monitor his liver and other vital organs through blood tests and that appropriate referrals would be made based on clinical findings and blood test results.

On the basis on this record, no reasonable juror could find that either defendant Bowens or Kaplan were deliberately indifferent to the plaintiff's serious medical needs. Moreover, to the extent that the plaintiff maintains a due process claim for violation of his right to refuse unwanted medical treatment, there is nothing in the record indicating that he was required or forced to accept the treatment. *See Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261, 278-79 (1990); *Washington v. Harper*, 494 U.S. 210, 221-22 (1990). Therefore, the defendants' motion for summary judgment will be granted. The plaintiff's remaining motions will be denied.

## ORDER

**IT IS THEREFORE ORDERED** that the defendants' motion for summary judgment (Docket #113) is **granted**.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment dismissing the plaintiff's claims and this action.

41

**IT IS FURTHER ORDERED** that the plaintiff's motion for order that no additional pleadings be accepted (Docket #114) is **denied**.

**IT IS FURTHER ORDERED** that the plaintiff's motion for sanctions (Docket #116) is **denied**.

**IT IS FURTHER ORDERED** that the plaintiff's motion requesting additional time to bring plaintiff's reply to defendants' renewed motion for summary judgment into compliance if needed (Docket #119) is **denied**.

Dated at Milwaukee, Wisconsin, this 14th day of August, 2006.

**SO ORDERED,**


s/ Rudolph T. Randa
**HON. RUDOLPH T. RANDA**
**Chief Judge**

42